

**FILED**
U. S. DISTRICT COURT
**EASTERN DISTRICT ARKANSAS**

FEB 2 7 2020

**JAMES W. McCORMACK, CLERK**
By:_____
**DEP CLERK**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

YVONNE LAWRENCE LEE, INDIVIDUALLY AND
AS ADMINSTRATRIX OF THE ESTATE OF
KENNETH LAWRENCE, DECEASED                          PLAINTIFF

VS.                    CASE NO.: 4:19-CV-00178-LPR

CHARLES "DOC" HOLLADAY, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY AS FORMER SHERIFF
OF PULASKI COUNTY; MIKE SYLVESTER,
INDIVIDUALLY AND HIS OFFICIAL CAPACITY AS
FORMER CHIEF OF DETENTION OF THE PULASKI COUNTY
REGIONAL DETENTION FACILITY; DR. KAREN CHASE,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY,
TURN KEY HEALTH CLINICS, LLC, ERIC HIGGINS, IN
HIS OFFICIAL CAPACITY AS SHERIFF OF PULASKI
COUNTY; SERGEANT ANTHONY JENKINS, IN HIS INDIVIDUAL
 AND OFFICIAL CAPACITY, DEPUTY LEDREY JUNIOR IN HIS
INDIVIDUAL AND OFFICIAL CAPACITY; DEPUTY CODY STONE,
IN HIS INDIVIDUAL AND OFFICIAL; DEPUTY RICHARD MURPHY,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; LIEUTENANT RODNEY
SHEPPARD, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY,
JACOB MITCHELL, R.N.;STEVEN COOK, R.N.,
JOHNATHON NGUYEN, R.N.; JOHN AND JANE DOES 1 - 10      DEFENDANTS

## SECOND AMENDED AND SUBSTITUTED COMPLAINT

COMES NOW the Plaintiff, Yvonne Lawrence Lee, as Administrator of the Estate of Kenneth Lawrence, by and through undersigned counsel, and for her Second Amended and Substituted Complaint against the Defendants, and hereby alleges and states as follows:

## JURISDICTION AND VENUE

1.   This is an action in tort and for violations of Federal and State Constitutional Rights.  Relief is also sought pursuant to 42 U.S.C. § 1983, the Fourth, the Fifth and the Fourteenth

1

Amendments to the United States Constitution, the Arkansas Constitution Article II, Section II, the Arkansas Civil Rights Acts, codified at Ark. Code Ann. § 16-123-105, Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504)and common law tort of negligence and wrongful death. Jurisdiction and venue is proper in this Court as the cause of action arose in Pulaski County, Arkansas.

2.    This is also an action seeking declaratory relief pursuant to Ark. Code Ann. § 16-111-104, part of the Declaratory Judgment Act, and 28 U.S.C.S. § 2201 to declare the rights and other relations between the parties and for damages.

**PARTIES**

3.    The Plaintiff, Yvonne Lawrence Lee, during all times mentioned, and continuing up to the present date is a citizen of the United States, and was at all times relevant to this Complaint, a resident of the City of North Little Rock, County of Pulaski, and State of Arkansas. She was appointed Administrator of the Estate of Kenneth Lawrence on September 29, 2017 by the Circuit Court of Pulaski County, Arkansas, Case No. 60PR-17-1436, and brings this action individually and on behalf of the Estate of Kenneth Lawrence, his heirs and statutory wrongful death beneficiaries.

4.    At all relevant times, Defendant Charles "Doc" Holladay (hereinafter referred to as "Holladay" or "Sheriff Holladay") was

the legally constituted Sheriff of Pulaski County, Arkansas and functioned in that capacity at all times relevant hereto. Furthermore, as Sheriff, Defendant Holladay was at all relevant times in question the chief decision and policy maker for the Pulaski County Regional Detention Facility ("PCRDF" or "County Jail"). And, as Sheriff of Pulaski County, it was the duty of Defendant Holladay to properly supervise the personnel under his control so as not to cause injuries to, or deprive the civil rights of persons the sheriff's department is obligated to protect. Defendant, Eric Higgins, was sworn in as the duly elected and constituted Sheriff of Pulaski County, Arkansas on January 1, 2019. He is sued in his official capacity.

5.    At all relevant times pertinent, Defendant Mike Sylvester was the Chief over the penal or lockup aspect of the PCRDF. At all relevant times pertinent, Defendant Mike Sylvester, was the Jail Administrator.

6.    Pulaski County is a political subdivision of the State of Arkansas under the name of which the individual Defendants performed all acts and omissions alleged herein.

7.    Defendant, Dr. Karen Chase, is a medical doctor who at all relevant times complained of in this action resided in Pulaski County, Arkansas.    At all times mentioned in this pleading, Defendant Dr. Chase was a medical doctor, and was licensed to practice in such profession as provided by the laws of the State

3

of Arkansas.  Defendant Dr. Chase held herself out to possess the degree of skill, ability, and learning common to a doctor in the community.

8.    Defendant, Turn Key Health Clinics, LLC., is a foreign company authorized to do and doing business in Pulaski County, Arkansas.  Defendant, Turn Key Health Clinics, LLC entered into a contract with Defendant Holladay and Pulaski County, Arkansas to provide health care services to inmates at the PCRDF.  The relevant terms of the contract commenced on December 1, 2016 and continued through December 31, 2017.  Defendant Turnkey Health Clinics, LLC was responsible for the actions of Defendant Dr. Karen Chase, Jacob Mitchell, R.N., Steve Cook, R.N., Jonathon Nguyen, R.N. and other medical staff which it employed or contracted with to provide medical services to the PCRDF.  As such, it is liable for the actions of these individuals under a contract theory and under the theory of *respondeat superior*.  Further, it may not claim immunity because it was required, and did in fact, maintain a professional liability insurance policy which provided coverage for Kenneth Lawrence and his Estate.

9.    Defendant,  Sergeant  Anthony  Jenkins  (hereinafter referred to as "Sgt. Jenkins" or "Jenkins", was at all relevant times herein, an employee of the Pulaski County Regional Detention Facility.  Defendant, Sgt. Jenkins, struck Kenneth Lawrence in the face and had other physical contract with Kenneth Lawrence that

4

caused injuries to Kenneth Lawrence's person.   Defendant Sgt. Jenkins administered capsicum (Pepper Spray) to Kenneth Lawrence and had other physical contract with Kenneth Lawrence that caused injuries to his person.   At all times and places alleged herein the individual Defendant was acting as an agent for and of the Pulaski County Regional Detention Facility and Pulaski County.

10.   Defendant, Deputy Ledrey Junior (hereinafter referred to as "Deputy Junior" or "Junior", was at all relevant times herein, an employee of the Pulaski County Regional Detention Facility. Defendant, Deputy Junior, may have struck Kenneth Lawrence, had other physical contract with Kenneth Lawrence and handcuffed Kenneth Lawrence in a manner that caused injuries to Kenneth Lawrence's person.   At all times and places alleged herein the individual Defendant was acting as an agent for and of the Pulaski County Regional Detention Facility and Pulaski County.

11.   Defendant, Deputy Cody Stone (hereinafter referred to as "Deputy Stone" or "Stone", was at all relevant times herein, an employee of the Pulaski County Regional Detention Facility. Defendant, Deputy Stone, may have struck Kenneth Lawrence, had other physical contract with Kenneth Lawrence and handcuffed Kenneth Lawrence in a manner that caused injuries to Kenneth Lawrence's person.   At all times and places alleged herein the individual Defendant was acting as an agent for and of the Pulaski County Regional Detention Facility and Pulaski County.

12.   Defendant, Deputy Richard Murphy (hereinafter referred to as "Deputy Murphy" or "Murphy", was at all relevant times herein, an employee of the Pulaski County Regional Detention Facility.   Defendant, Deputy Murphy, may have struck Kenneth Lawrence, had other physical contract with Kenneth Lawrence and handcuffed Kenneth Lawrence in a manner that caused injuries to Kenneth Lawrence's person.   At all times and places alleged herein the individual Defendant was acting as an agent for and of the Pulaski County Regional Detention Facility and Pulaski County.

13.   Defendant, Lieutenant Rodney Sheppard (hereinafter referred to as "Lt. Sheppard" or "Sheppard"), was at all relevant times herein an employee of the Pulaski County Regional Detention Facility.   Defendant, Lt Sheppard, ordered Kenneth Lawrence to be restrained in a restraint chair and further ordered that a spit mask be placed over his face.   At all times and places alleged herein the individual Defendant was acting as an agent for and of the Pulaski County Regional Detention Facility and Pulaski County.

14.   Defendant, Jacob Mitchell, R.N. was at all relevant times a part of the staff of Defendant Turnkey responsible for providing medical and nursing services to inmates detained in the Pulaski County Regional Detention Facility.

15.   Defendant, Steven Cook, R.N. was at all relevant times a part of the staff of Defendant Turnkey responsible for providing

6

medical and nursing services to inmates detained in the Pulaski County Regional Detention Facility.

16.   Defendant, Johnathan Nguyen, R.N. was at all relevant times a part of the staff of Defendant Turnkey responsible for providing medical and nursing services to inmates detained in the Pulaski County Regional Detention Facility.

17.  Defendants Jane and John Does 1 though 10 are the currently unknown Pulaski County Detention Facility employees, medical, nursing, and/or other healthcare providers and entities, insurers, and employees or agents of PCRDF, entities, and individuals, charged with protecting and treating Kenneth Lawrence at the PRCDF. Plaintiff has attached hereto the affidavit of Plaintiff's attorney attesting that the identities of Jane and John Does 1 through 10 are unknown pursuant to A.C.A. § 16-56-125.

## **FACTUAL ALLEGATIONS**

18.   Under Section 1.17 of the Contract between Defendant Turn Key Health Clinics LLC and the Pulaski County Regional Detention Facility entitled Contract For Comprehensive Health Services at the Pulaski County Regional Detention Center, Little Rock, Arkansas, (hereinafter referred to as "Contract"), the following was agreed to: ***All medical personnel providing services through Contractor under this Contract shall be the employees and/or agents of Contractor and not of the Agency. Such individuals shall hereby be referred to as the "Medical Staffing". All wages,***

7

*worker's compensation, insurance, benefit vacations, and claims of any kind relating to the Medical Staffing shall be the sole responsibility of Contractor and not of Agency.* Defendant Turn Key Health Clinics, LLC was responsible for the contract with Defendants Dr. Chase, Dr. Chase, Mitchell, Cook, Nguyen and other medical care providers at the PCRDF. Section 1.17 of the Contract also provided the following:

> *Contractor shall provide medical unit coverage seven days a week in accordance to the matrix in Attachment A.*
>
> *The Contractor shall ensure:*
>
> *a) Initial health screenings are performed for inmates upon admission to the facility;*
> *b) Tuberculosis Skin Testing (TST) for all inmates within fourteen (14) days of incarceration;*
> *c)  Medications are administered as prescribed;*
> *d) Timely stick call triage and follow-up;*
> *e) Appropriate and timely response to medical needs and emergencies; and*
> *f) Operations are in compliance with Arkansas Jail Standards (AJS) and the National Commission on Correctional Health Care (NCCHC)*
>
> *Medical care shall be provided in a manner that is commensurate with the community standard of medical care and treatment;*

The Defendants Turnkey, Dr. Chase, Mitchell, Cook, Nguyen and all other medical care personnel were also required under Section 1.2 of their Contract with the PCRDF to carry professional liability insurance in the minimum amount of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000).

8

19.  On June 8, 2017 at approximately 9:20 a.m., Kenneth Lawrence arrived at the Pulaski County Regional Detention Facility.  He was brought into the facility after being arrested on a Probation Revocation warrant.

20.  At approximately 10:00 a.m., Kenneth Lawrence is seen on surveillance tape at the PCRDF entering the medical room to talk to the nurse prior to being booked into the PRDF.  Shane Pomaybo electronically signed the Medical Intake Records that were conducted on Kenneth Lawrence.  On the form, Pomaybo checked "Yes" in answer to the question "Is the patient currently taking any medications?"  The form contained the next question:  "If yes to above question, list all current medications including dosages, frequency, last time taken, and name of pharmacy:" Pomaybo answered as follows:  "unk seizure medication 2x daily last dose this morning; Walmart Cabot."

21.  Kenneth Lawrence suffered from a seizure disorder which required that he take Keppra twice a day to control his seizures. Keppra is an antiepileptic drug available as 250 mg (blue), 500 mg (yellow), 750 mg (orange), and 1000 mg (white) tablets and as a clear, colorless, grape-flavored liquid (100 mg/mL) for oral administration.  There is a specific warning with regards to Keppra.  "Stopping KEPPRA suddenly can cause serious problems. Stopping a seizure medicine suddenly can cause seizures that will not stop (status epilepticus)."

9

22.   The Defendants knew or should have known about Kenneth Lawrence's seizure condition that was being treated with Keppra. Kenneth Lawrence had previously had a seizure while incarcerated at the PCRDF.   On the first page of the Intake Form that was completed during Kenneth Lawrence's intake, there is the following question:   "Have you ever been incarcarated at this facility? If yes, provide year:"  Pomaybo responded:   "Yes" "2017"

23.   On May 4, 2016, LPN M. Mannis, completed an Altercation Form regarding Kenneth Lawrence in which she documented that "i/m (inmate) laying on the floor having seizure like activity."   On May 4, 2016 a screening form indicates that Kenneth Lawrence's current medication was "Keppra."

24.   The Intake Form signed by Pomaybo contains the following notation:   Approved by: Mary Bahan Approved on: 6/8/2017 2:45:29 PM "verified keppra 250mg two tabs bid. intake forwarded to dr chase for med approval"

25.   The Defendants knew Kenneth Lawrence was required to take Keppra two times each day.   The Defendants also knew that the last dosage of Keppra was taken by Kenneth Lawrence prior to his arrest on the morning of June 8, 2017.   Despite this knowledge, the Defendants failed to give Kenneth Lawrence Keppra.   This fact is born out by Defendants' Medical Administration Records.   These Medical Administration Records are kept on inmates at the PCRDF.

Kenneth Lawrence's medical records do not contain any record that he was administered Keppra during this period of incarceration.

26.   On June 8, 2017, at approximately 11:35 a.m., Kenneth Lawrence was taken to the D Unit of the PCRDF.  He was assigned to cell D-109.

27.   On June 9, 2017, sometime before 8:53 a.m., Kenneth Lawrence suffered a seizure while in cell D 109 in the D Unit of the PCRDF.

28.   During an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2.  Clear hard or sharp objects away from the person.  3. Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear.  5.  Look at your watch at the start of the seizure, to time its length.  6. Don't put anything in his mouth.  Indeed, these were the exact rules followed during Kenneth Lawrence's previous seizure at the PCRDF in 2016.  He was found on the floor and left unrestrained until the seizure stopped.

29.   On June 9, 2017, at or around 8:50 a.m., Deputy Ledrey Junior was assigned to the D Unit of the PCRDF.  At or around 8:53 a.m. on June 9, 2017, Emilo Sacul, an inmate who shared the cell with Kenneth Lawrence, came to the Deputy Station and stated, "There's a guy having a seizure."

30. At the time, Deputy Junior was conducting Pill Call. Pill Call is a time when inmates who need medication are administered medication by healthcare providers employed by Defendant Turnkey. Defendant, Johnathan Nguyen, was the healthcare provider assigned to the Pill Cart. Defendant Nguyen heard Sacul say that "(t)here's a guy having a seizure."

31. Defendant Nguyen stayed with the pill cart while Deputy Junior checked on Kenneth Lawrence. When Deputy Junior walked to the cell, he indicated that Kenneth Lawrence was on the floor. Deputy Junior then opened the door and asked Kenneth Lawrence if he was ok. Deputy Junior then called a Code Red (Medical Emergency).

32. Defendant Nguyen came to the cell where Kenneth Lawrence lay on the floor.

33. When Defendant Nguyen approached Kenneth Lawrence, he indicated that he found him laying on the floor on his left side in a postictal state with his respirations deep and labored. The postictal state is the altered state of consciousness after an epileptic seizure. It usually lasts between 5 and 30 minutes, but sometimes longer in the case of larger or more severe seizures, and is characterized by drowsiness, confusion, nausea, hypertension, headache or migraine, and other disorienting symptoms. Defendant Nguyen indicated that Kenneth Lawrence was diaphoretic, which means that he was sweating heavily. Defendant

12

Nguyen noted that Kenneth Lawrence had a 1 cm area to his left eye
and 3 cm swelling around the same area. Defendant Nguyen also noted
that other staff arrived.  Defendant Nguyen noted that Kenneth
Lawrence's vitals were obtained.  Defendant Nguyen noted that
Kenneth Lawrence was still in a postictal state and responded to
painful stimuli which was a sternum rub conducted by Defendant
Jacob Mitchell.

34. When Defendant Jacob Mitchell approached Kenneth
Lawrence, he indicated that Kenneth Lawrence was in the supine
position with top of his head toward cell exit on his initial
encounter. The supine position indicates that Kenneth Lawrence was
laying on his back.  Defendant Mitchell also indicated that Kenneth
Lawrence had a 1 cm open area to left brow with 3 cm raised area
surrounding that same area. Defendant Mitchell indicated that
there were no other injury noted. Defendant Mitchell conducted two
(2) sternum rubs.  A sternum rub is the application of painful
stimuli with the knuckles of closed fist to the center chest of a
patient who is not alert and does not respond to verbal stimuli.
Defendant Mitchell indicated that Kenneth Lawrence responded to
painful stimuli and became combative at 0902 requiring Jail staff
to call a Code Blue, requiring forceful restraint. According to
Defendant Mitchell, in the attempt to restrain there was 5 times
that arms contacted patient's face. Blood was present on patient's
nose at this point. He was restrained until he could be placed to

the restraint chair. Fifty (50) mg Thorazine IM to right shoulder and transported via restraint chair to be assessed by Dr. Chase. At 0932 Nurse Cook LPN was unable to auscultate respirations. Patient was transferred to the floor and CPR was initiated. Ambu Bag initiated, AED applied. At 0945 Epinephrine was pushed. MEMS arrived and took over with care. Patient pulse 45, transported by MEMS.

35.   During the seizure Kenneth Lawrence suffered on June 9, 2017, Defendant Sergeant Anthony Jenkins, struck Kenneth Lawrence and attempted to restrain him.  Defendant Jenkins aso administered Pepper spray.  Pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak.  Upon information and belief, either Mitchell, Cook, Nguyen or John Doe #3 administered Thorazine to Kenneth Lawrence's right shoulder on direction from Defendant Dr. Chase. Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain.

36.   Kenneth Lawrence was strapped to a restraint chair that made it impossible for him to move his arms or legs.  In addition, a spit mask was place on his head.  This mask covered his entire face.   The spit mask restricted Kenneth Lawrence's ability to breathe.   Kenneth Lawrence had been administered pepper spray. Pepper spray makes it difficult to breath.  In addition, pepper spray requires steps for the individual to be properly

14

decontaminated:  Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching the solution can easily spread it to other areas of the body.  If pepper spray enters the eyes, blinking rapidly might help to flush it out.  Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area.  People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution.  Instead of properly decontaminating Kenneth Lawrence, the Defendants put a spit mask on his face that further acted as a means of suffocating him. Kenneth Lawrence was then transported out of the D Unit to the medical unit.

37. During transport, Kenneth Lawrence went into cardiac arrest and stopped breathing.  This was foreseeable given in light of the fact that he had just suffered a seizure, was struck, pepper sprayed, restrained, had his face covered with a spit mask and administered Thorazine.  According to a note by Defendant Dr. Chase, "patient was down for approx. 9 minutes with no consistent pulse."

38. MEMS was called and Kenneth Lawrence was transported to UAMS.  Before Kenneth Lawrence could be taken out of the facility

15

by MEMS, MEMS personnel had to stop in the hallway of the facility to resuscitate him.

39.  PCRDF had emergency contact information on Kenneth Lawrence on the Intake Form that he completed.  Plaintiff's name and phone number were listed as an emergency contact.  However, Defendants misinformed and mislead Plaintiff as to Kenneth Lawrence's whereabouts.  Defendants also failed to provide the Hospital with contact information.  As a result, Kenneth Lawrence lay in the hospital at the point of death, with no family member, next of kin or emergency contact there with him.

40.  On June 19, 2017, after a valiant fight, Kenneth Lawrence died.  An autopsy performed by the Arkansas State Crime Laboratory medical examiner lists his cause of death as Anoxic Encephalopathy due to Undetermined Etiology.  Anoxic Encephalopathy is a condition where brain tissue is deprived of oxygen and there is global loss of brain function. It list the contributory causes as struggle restraint and capsicun (pepper) spray exposure.

41.  Kenneth Lawrence was a pretrial detainee.  A detainee may not be punished prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535-536 (1979.  Due process rather than Eighth Amendment applies to pretrial detainees because such detainees may not be punished at all.  *Bell,* 441 U.S. at 537 n. 16.  *Bell* held that detainees cannot be punished, and, thus, rigorous Eighth Amendment standards should not apply in assessing

16

their conditions of confinement. Due process limits the government's power to deprive an individual of personal liberty. *United States v. Neal*, 679 F.3d 737, 740 (8th Cir. 2012). Freedom from bodily restraint is at the "core" of the due process clause. *Heidemann v. Rother*, 84 F.3d 1021, 1028 (8th Cir. 1996). At its heart, the Due Process Clause protects the individual from arbitrary government action. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

42. The test often used in determining whether action by the executive branch of government is arbitrary is whether the conduct shocks the conscience. *United States v. Salerno*, 481 U.S. 739, 750-751 (1987). Conduct deliberately intended to cause some unjustifiable harm will generally shock the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Conduct involving recklessness or gross negligence is actionable under the Due Process Clause. *Id.* A government official will have engaged in conscience-shocking behavior not only by causing intentional harm, but also by acting with deliberate indifference to an individual's serious medical or other needs. *Id.*

43. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the United States Supreme Court held that where officials make a deliberate decision to deny objectively necessary medical treatment, no further mens rea should be necessary to prove a substantive due process violation. Nonetheless, most appellate

courts have continued to impose the Eighth Amendment's criminal subjective mens rea standard, even after *Kingsley*.   In *Bailey v. Feltmann*, 810 F.3d 589, 593-94 (8th Cir. 2016), the Eighth Circuit held that, although *Kingsley* adopted an objective reasonableness standard for arrestees claiming excessive force, the law regarding denial of medical care is not clear, and thus, to survive qualified immunity, pretrial detainee must prove deliberate indifference under the Eighth Amendment standard.   In *Bailey*, the Court found that the Plaintiff failed to produce sufficient evidence to show that Defendant had actual knowledge of an objectively serious medical need and yet deliberately disregarded it.   The Eighth Circuit has held that a pretrial detainee who alleged a violation of his right to medical care must meet Eighth Amendment deliberate indifference standard, and merely demonstrating that prison doctor committed medical malpractice did not meet this standard absent evidence that the doctor's actions were so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.   *Jackson v. Buckman*, 756 F.3d 1060, 1065-66 (8th Cir. 2014)

44.   In *Shepherd v. Washington County*, 331 Ark. 480, 962 S.W.2d 779 (1998), the Arkansas Supreme Court rejected the federal standard of "deliberate indifference" for cases arising under the Arkansas Civil Rights Act. Instead, The Court opted for a standard of "conscious indifference," as defined by this Arkansas court's

previous opinions. In order to demonstrate that a Defendant acted with conscious indifference, a Plaintiff must show that the Defendant "knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in the reckless disregard of the consequences from which malice can be inferred." *Shepherd*, 331 Ark. at 504, 962 S.W.2d 779 (quoting *Dongary Holstein Leasing, Inc. v. Covington*, 293 Ark. 112, 732 S.W.2d 465 (1987), rev'd on other grounds, *Quinn Companies, Inc. v. Herring-Marathon Group, Inc.*, 299 Ark. 431, 773 S.W.2d 94 (1989)). Therefore, malice can be inferred either from conscious indifference to the consequences of one's actions or from a reckless disregard of those same consequences. *Id*. A medical need is serious if it is a condition that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Williams v. Arkansas Dept. of Correction*, 207 S.W.3d 519, 362 Ark. 134 (Ark., 2005)

### **FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 USC § 1983, STATE CIVIL RIGHTS VIOLATIONS UNDER THE ARKANSAS CIVIL RIGHTS ACT AND THE ARKANSAS CONSTITUTION**

45. The Plaintiff adopts by reference the allegations contained in paragraphs 1 through 44 above.

### **FEDERAL CLAIMS:  DR. KAREN CHASE, TURNKEY, JACOB MITCHELL, R.N., STEVEN COOK, R.N., JOHNATHON NGUYEN, R.N. AND UNKNOWN JOHN DOE MEDICAL CARE DEFENDANTS**

19

46.    The above recited acts and omissions of Defendants, Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does while each was acting under color of authority and in their individual and official capacities, respectively constitute a deprivation of the Kenneth Lawrence's substantive due process rights as guaranteed by the 14th Amendment to the United States Constitution. Such acts of Defendants Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which the Plaintiff seeks damages as set forth herein above.

47.    These Defendants, Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does, were aware of an objectively serious medical need that Kenneth Lawrence had, in that, they knew that:

a.    Detainees in the PRCDF have medical conditions that require medication that they are taking that cannot be abruptly stopped without causing serious medical harm;

b.    Stopping Keppra suddenly from individuals that are taking it to control seizures can cause serious problems;

c.    Stopping a seizure medicine such as Keppra suddenly can cause seizures that will not stop (status epilepticus);

20

d.   Kenneth Lawrence suffered from a seizure disorder which required that he take Keppra twice a day to control his seizures;

e.   Kenneth Lawrence had only taken one (1) of the two dosages of Keppra that he needed to take to control his seizures;

f.   Kenneth Lawrence had previously had a seizure in the PCRDF during an incident when he had not been prescribed Keppra;

g.   During an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2.  Clear hard or sharp objects away from the person.  3. Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear. 5.  Look at your watch at the start of the seizure, to time its length.  6. Don't put anything in his mouth.  These were the exact rules followed during Kenneth Lawrence's previous seizure at the PCRDF in 2016.  He was found on the floor and left unrestrained until the seizure had stopped.

h. Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain.

g. Pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak.

h.  Pepper spray requires steps for the individual to be properly decontaminated:  Since the spray is oil-based, people who

have it on their skin are advised not to touch the affected area.
Touching the solution can easily spread it to other areas of the
body.  If pepper spray enters the eyes, blinking rapidly might
help to flush it out.  Washing with hand soap, shampoo, or dish
soap can break up the oil. After that, the area should be rinsed
with water. Baby shampoos can be useful for washing spray from the
eye area.  People who have been sprayed may instinctively want to
douse themselves in water. This can provide instant but short-
lived relief. Oil does not mix with water on a molecular level, so
washing the skin with water alone will not remove the solution.

48.    These Defendants, Dr. Karen Chase, Turn Key Health
Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon
Nguyen, R.N. and John Does, actions were in deliberate indifference
to the Plaintiff's health and safety needs. In addition, these
actions were so inappropriate as to evidence intentional
maltreatment and a refusal to provide essential care as evidenced
by:

a.  The Defendants failed to insure that Kenneth Lawrence
received any dosages of Keppra which he needed to control his
seizures;

b.  Despite being aware of Kenneth Lawrence's seizure
condition, in deliberate indifference, Defendants took no action
to see to it that people were kept out of his way; to clear hard
or sharp objects away from him; to prevent efforts to hold him

22

down or to stop his movements; to place him on his side; to help keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

c. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

d.   After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

e.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the guards from putting a spit mask on him;

f.   Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants administered Thorazine to Kenneth Lawrence.

### STATE CLAIMS:  DR. KAREN CHASE, TURNKEY, JACOB MITCHELL, R.N., STEVEN COOK, R.N., JONATHON NGUYEN, R.N. AND UNKNOWN JOHN DOE MEDICAL CARE DEFENDANTS

49.   The above recited acts and omissions of Defendants, Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does, while each was acting under color of authority and in their individual and official capacities, respectively constitute a deprivation of the Kenneth Lawrence's rights under Ark. Const. Art. 2 § 2  which provides that: "All men are created equally free and independent, and have certain inherent and inalienable rights; amongst which

23

are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property, and reputation; and of pursuing their own happiness"  and  the Arkansas Civil Rights Act which is codified at Ark. Code Ann. § 16-123-105 which provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress."

50. The Defendants, Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does, knew, or ought to have known, in the light of the surrounding circumstances, that their conduct would naturally or probably result in injury and that they continued such conduct in the reckless disregard of the consequences from which malice can be inferred.  The Defendants, Dr. Karen Chase, Turn Key Health Clinics, LLC, Jacob Mitchell, R.N., Steven Cook, R.N., Johnathon Nguyen, R.N. and John Does, were consciously indifferent to the consequences of their actions and they recklessly disregarded those same consequences.  This was evident by the following:

a.   Detainees in the PRCDF have medical conditions that require medication that they are taking that cannot be abruptly stopped without causing serious medical harm;

b.   Stopping Keppra suddenly from individuals that are taking it to control seizures can cause serious problems.

c.   Stopping a seizure medicine such as Keppra suddenly can cause seizures that will not stop (status epilepticus);

d.   Kenneth Lawrence suffered from a seizure disorder which required that he take Keppra twice a day to control his seizures;

e.   Kenneth Lawrence had only taken one (1) of the two dosages of Keppra that he needed to take to control his seizures;

f.   Kenneth Lawrence had previously had a seizure in the PCRDF during an incident when he had not been prescribed Keppra;

g.   During an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2.  Clear hard or sharp objects away from the person.  3. Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear. 5.  Look at your watch at the start of the seizure, to time its length.  6. Don't put anything in his mouth.  These were the exact rules followed during Kenneth Lawrence's previous seizure at the PCRDF in 2016.  He was found on the floor and left unrestrained until the seizure had stopped.

25

h. Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain.

i. Pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak.

j.  Pepper spray requires steps for the individual to be properly decontaminated:  Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching the solution can easily spread it to other areas of the body.  If pepper spray enters the eyes, blinking rapidly might help to flush it out.  Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area.  People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution.

k.  The Defendants failed to insure that Kenneth Lawrence received any dosages of Keppra which he needed to control his seizures;

l.  Despite being aware of Kenneth Lawrence's seizure condition, in deliberate indifference, Defendants took no action to see to it that people were kept out of his way; to clear hard or sharp objects away from him; to prevent efforts to hold him

down or to stop his movements; to place him on his side; to help keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

   m. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

   n.   After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

   o.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the guards from putting a spit mask on him;

   p.   Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants administered Thorazine to Kenneth Lawrence.

### FEDERAL CLAIMS:  DEPUTY SHERIFFS AND JOHN DOE DEFENDANTS

51.   The above recited acts and omissions and those hereinafter alleged of Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does who were Deputy Sheriffs, were committed while each was acting under color of authority and in their individual and official capacities.   The aforementioned conduct and omissions respectively constitute a deprivation of the Kenneth Lawrence's substantive due process rights as guaranteed by the 14th Amendment to the United States

27

Constitution. Such acts of Defendants while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which the Plaintiff seeks damages as set forth herein above.

52.   These Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does Deputy Sheriffs, were aware of an objectively serious medical need that Kenneth Lawrence had, in that, they knew that:

a.   Detainees in the PRCDF have medical conditions that require medication that they are taking that cannot be abruptly stopped without causing serious medical harm;

b.   During an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2.  Clear hard or sharp objects away from the person. 3.  Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear.  5.  Look at your watch at the start of the seizure, to time its length.  6. Don't put anything in his mouth.  These were the exact rules followed during Kenneth Lawrence's previous seizure at the PCRDF in 2016.  He was found on the floor and left unrestrained until the seizure had stopped.

c. Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain.

d. Pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak.

e. Pepper spray requires steps for the individual to be properly decontaminated:  Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching the solution can easily spread it to other areas of the body.  If pepper spray enters the eyes, blinking rapidly might help to flush it out.  Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area.  People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution.

53. These Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does Deputy Sheriffs, actions were in deliberate indifference to the Plaintiff's health and safety needs. In addition, these actions were so inappropriate as to evidence intentional maltreatment and a refusal to provide essential care as evidenced by:

a. Despite being aware of Kenneth Lawrence's seizure condition, in deliberate indifference, Defendants took no action

to see to it that people were kept out of his way; to clear hard or sharp objects away from him; to prevent efforts to hold him down or to stop his movements; to place him on his side; to help keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

b.    The Defendants struck Kenneth Lawrence causing his nose to be fractured;

c.    The Defendants stood by and allowed the Kenneth Lawrence to be struck;

d.    The Defendant pepper sprayed Kenneth Lawrence;

e. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

f.    After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

g.    After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendant put a spit mask on him;

h.    After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the Defendant from putting a spit mask on him;

i.  Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants allowed Thorazine to be administered to Kenneth Lawrence.

### STATE CLAIMS:  DEPUTY SHERIFF AND JOHN DOE DEFENDANTS

30

54.    The above recited acts and omissions of Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does Deputy Sheriffs, while each was acting under color of authority and in their individual and official capacities, respectively constitute a deprivation of the Kenneth Lawrence's rights under Ark. Const. Art. 2 § 2  which provides that: "All men are created equally free and independent, and have certain inherent and inalienable rights; amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property, and reputation; and of pursuing their own happiness"  and  the Arkansas Civil Rights Act which is codified at Ark. Code Ann. § 16-123-105 which provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress."

55. The Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does Deputy Sheriffs, knew, or ought to

have known, in the light of the surrounding circumstances, that their conduct would naturally or probably result in injury and that they continued such conduct in the reckless disregard of the consequences from which malice can be inferred.  The Defendants, Sergeant Anthony Jenkins, Lieutenant Rodney Sheppard, Deputy Ledrey Junior, Deputy Cody Stone, Deputy Richard Murphy and John Does Deputy Sheriffs, were consciously indifferent to the consequences of their actions and they recklessly disregarded those same consequences.  This was evident by the following:

a.  The Defendants knew or should have known that detainees in the PRCDF have medical conditions that require medication that they are taking that cannot be abruptly stopped without causing serious medical harm;

b.  The Defendants knew or should have known that during an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2. Clear hard or sharp objects away from the person.  3.  Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear.  5.  Look at your watch at the start of the seizure, to time its length.  6.  Don't put anything in his mouth;

c.  The Defendants knew or should have known that Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain;

32

d. The Defendants knew or should have known that pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak;

e. The Defendants knew or should have known that pepper spray requires steps for the individual to be properly decontaminated: Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching the solution can easily spread it to other areas of the body. If pepper spray enters the eyes, blinking rapidly might help to flush it out. Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area. People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution;

f. The Defendants knew or should have known that a detainee should not be struck while suffering a seizure in such a manner that it would fracture his nose;

g. The Defendants knew or should have known that a spit mask should not be placed on a detainees face after he has been pepper sprayed until after he has been properly decontaminated.

h. Despite being aware of Kenneth Lawrence's seizure condition, in deliberate indifference, Defendants took no action

to see to it that people were kept out of his way; to clear hard or sharp objects away from him; to prevent efforts to hold him down or to stop his movements; to place him on his side; to help keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

      i.   The Defendant struck Kenneth Lawrence causing his nose to be fractured;

      j.   The Defendants stood by and allowed the Kenneth Lawrence to be struck;

      k.  The Defendant pepper sprayed Kenneth Lawrence;

      l. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

      m.  After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

      n.  After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendant put a spit mask on him;

      o.  After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the Defendant from putting a spit mask on him;

      p.  Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants allowed Thorazine to be administered to Kenneth Lawrence.

**SUPERVISORY CLAIMS:   SHERIFF CHARLES "DOC" HOLLADAY; MIKE SYLVESTER; AND SHERIFF ERIC HIGGINS**

56.   These actions of the Defendants Holladay and Sylvester, amounted to intentional maltreatment or a refusal to provide essential care.   Sheriff Higgins is the present Sheriff and is only sued in his official capacity.

57.   The actions of the Defendants were the result of Holladay's decisions and practices as Sheriff which were tantamount to official policies.

58.   Furthermore, these actions were the results of Holladay's failure in hiring, to train, and supervise said Defendants. On other occasions, Detention officers under the direct control and supervision of Holladay, failed to protect other inmates who had suffered from medical conditions.   These failures to protect were failures in hiring, retention, instruction and training, control and/or supervise said officers and contractors are the results of Holladay's decisions as the chief policy and decision maker for the PRCDF as well as the long standing usages, customs, practices and policies of the Detention Center.

59.   Kenneth Lawrence's right to medical treatment and prescribed medication for diagnosed health issues was well established at the time such that a reasonable officer or medical care provider would be aware of the standard.   In addition, Kenneth Lawrence's right to be free from restraints to his airway caused

35

by pepper spray and spit masks was well established at the time such that a reasonable officer or medical care provider would be aware of that standard.

60.   These decisions were in derogation of the Kenneth Lawrence's rights and privileges protected by the 4th and 14th amendments to the U.S. Constitution, federal and state laws, Ark. Const. Art. 2 § 2, Ark. Const. Art. 2 § 6, Ark. Const. Art. 2 § 9, and the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq.

61.   The Defendants are not entitled to qualified immunity for their actions.

62.   The County, as a municipality, is not entitled to qualified immunity and is separately liable for the PRCDF's policies, usages, customs, practices and/or Holladay's decisions as the final decision and policy maker for the PRCDF which have the force and effect of law.

## TORT CLAIMS

63.   The Plaintiff adopts by reference the allegations contained in paragraphs 1 through 62.

64.   The foregoing actions by the Defendants were negligent. The actions fell below the applicable standards of care.   The Defendants failed to properly protect the Kenneth Lawrence.   The Defendants failed to properly provide Kenneth Lawrence with medication and failed to accommodate his housing needs.   The

Defendants were not properly trained on how to handle an inmate that suffered from a medical condition involving a seizure.  This medical condition was foreseeable.   The Defendants were not properly trained and failed to follow the appropriate standard of care when dealing with a person having a seizure by the conduct listed above and herein.

65.  As a result of the Defendants actions, the Plaintiff was damaged.   Plaintiff's damages were proximately caused by the actions of the Defendants.   To the extent they are covered by insurance, the Defendants have waived sovereign immunity for the negligence claims.

## AMERICANS WITH DISABILITY ACT CLAIM

66.  The Plaintiff adopts by reference the allegations contained in paragraphs 1 through 65.

67.  Kenneth Lawrence suffered from epilepsy which is a physical impairment that substantially limited one or more major his life activities.  He had a record of such impairment.  And, he was regarded as having an impairment.  Therefore, he is covered by the ADA and is disabled.

68.  All of the Defendants were covered by the American with Disabilities Act (hereinafter referred to as "ADA".)  All state and local governmental entities are covered by Title II, including law enforcement, jails and corrections, healthcare providers contracted by state or local governments.  The Supreme Court has

37

expressly held (in a unanimous decision) that the ADA's requirements apply to state and local detention centers. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998); See also Title II Regulations, 2010 Guidance and Section-by-Section Analysis. ADA applies to contractors for correctional organizations. 28 C.F.R. §35.152. The Supreme Court recently has held that Title II of the ADA validly abrogates state sovereign immunity – as least insofar as it creates a private cause of action for damages for conduct that actually violates the Fourteenth Amendment. *United States v. Georgia, et al.; Tony Goodman v. Georgia, et al.*, 546 U.S. 151 (2006)

69.   The Department of Justice has emphasized the importance of correctional facilities complying with the ADA.  It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to, proper medication and medical treatment

70.  ADA places an affirmative duty on the Defendants.  In *Pierce v. District of Columbia*, 128 F.Supp.3d 250 (D.D.C. 2015), a case involving the DC Detention Center, the Court wrote:

"[A]n entity that provides services to the public cannot stand idly by while people with disabilities attempt to utilize programs and services designed for the able-bodied; instead, to satisfy Section 504 and Title II, such entities may very well need to act

38

affirmatively to modify, supplement, or tailor their programs and services to make them accessible to persons with disabilities."

71.   The Defendants had a reasonable modification obligation because they knew or reasonably should known that the Kenneth Lawrence had a disability and needed a modification in the way they detained, handled and treated him, even when he could not request a modification, because he was suffering during a crisis brought on by his epilepsy which interfered with his ability to articulate a request to treat him differently."

72.   The ADA Coordinator failed to coordinate its efforts to comply with and carry out its responsibilities under the ADA. These failures included, but were not limited to:

        a.   Failure to have an ADA Coordinator who understands the ADA's requirements and to disseminate the identity of the ADA Coordinator to inmates and the public.

        b.   Failure to conduct periodic audits of a detention facility's ADA compliance.

        c.   Failure to conduct a needs assessment when law enforcement or a detention facility learns about an inmate's disability.

        d.   Failure to conduct ongoing needs assessment to ensure that an inmate's disability related needs are being met.

        e.   Failure to conduct an individualized assessment regarding the type of action that is required.

73.   The Defendants violated Kenneth Lawrence's rights under the ADA and caused him damages by including, but not limited to:

a.    The Defendants knew or should have known that detainees in the PRCDF have medical conditions that require medication that they are taking that cannot be abruptly stopped without causing serious medical harm;

b.    The Defendants knew or should have known that during an epiplitic seizure, there are commonly known rules that have to be followed: 1. Keep other people out of the way.  2. Clear hard or sharp objects away from the person.  3.  Don't try to hold down or stop the movements.  4.  Place on individual on his side, to help keep his airway clear.  5.  Look at your watch at the start of the seizure, to time its length.  6.  Don't put anything in his mouth;

c.  The  Defendants  knew  or  should  have  known  that Thorazine is an anti-psychotic medication.  It works by changing the actions of chemicals in your brain;

d. The Defendants knew or should have known that pepper spray causes burning in the throat, wheezing, dry cough, shortness of breath, gagging, gasping and the inability to breathe or speak;

e.  The Defendants knew or should have known that pepper spray  requires  steps  for  the  individual  to  be  properly decontaminated:  Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching

40

the solution can easily spread it to other areas of the body.  If pepper spray enters the eyes, blinking rapidly might help to flush it out.  Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area.  People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution;

      f.   The Defendants knew or should have known that a detainee should not be struck while suffering a seizure in such a manner that it would fracture his nose;

      g.  The Defendants knew or should have known that a spit mask should not be placed on a detainees face after he has been pepper sprayed until after he has been properly decontaminated.

      h.  Despite being aware of Kenneth Lawrence's seizure condition, in deliberate indifference, Defendants took no action to see to it that people were kept out of his way; to clear hard or sharp objects away from him; to prevent efforts to hold him down or to stop his movements; to place him on his side; to help keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

      i.   The Defendant struck Kenneth Lawrence causing his nose to be fractured;

j.   The Defendants stood by and allowed the Kenneth Lawrence to be struck;

k.   The Defendant pepper sprayed Kenneth Lawrence;

l. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

m.   After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

n.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendant put a spit mask on him;

o.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the Defendant from putting a spit mask on him;

p.   Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants allowed Thorazine to be administered to Kenneth Lawrence.

## §504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)CLAIM

74.   The Plaintiff adopts by reference the allegations contained in paragraphs 1 through 73.

75.   Kenneth Lawrence suffered from epilepsy which is a physical impairment that substantially limited one or more major his life activities.  He had a record of such impairment.  And, he

was regarded as having an impairment.  Therefore, he is disabled.
Further, the Defendants received Federal funds.

76.   The Defendants violated Kenneth Lawrence's rights under
the §504 of the Rehabilitation Act and caused him damages by
including, but not limited to:

a.   The Defendants knew or should have known that
detainees in the PRCDF have medical conditions that require
medication that they are taking that cannot be abruptly stopped
without causing serious medical harm;

b.   The Defendants knew or should have known that
during an epiplitic seizure, there are commonly known rules that
have to be followed: 1. Keep other people out of the way.  2.
Clear hard or sharp objects away from the person.  3.  Don't try
to hold down or stop the movements.  4.  Place on individual on
his side, to help keep his airway clear.  5.  Look at your watch
at the start of the seizure, to time its length.  6.  Don't put
anything in his mouth;

c.   The Defendants knew or should have known that
Thorazine is an anti-psychotic medication.  It works by changing
the actions of chemicals in your brain;

d. The Defendants knew or should have known that pepper
spray causes burning in the throat, wheezing, dry cough, shortness
of breath, gagging, gasping and the inability to breathe or speak;

e.   The Defendants knew or should have known that pepper spray requires steps for the individual to be properly decontaminated:  Since the spray is oil-based, people who have it on their skin are advised not to touch the affected area. Touching the solution can easily spread it to other areas of the body.  If pepper spray enters the eyes, blinking rapidly might help to flush it out.  Washing with hand soap, shampoo, or dish soap can break up the oil. After that, the area should be rinsed with water. Baby shampoos can be useful for washing spray from the eye area.  People who have been sprayed may instinctively want to douse themselves in water. This can provide instant but short-lived relief. Oil does not mix with water on a molecular level, so washing the skin with water alone will not remove the solution;

f.   The Defendants knew or should have known that a detainee should not be struck while suffering a seizure in such a manner that it would fracture his nose;

g.   The Defendants knew or should have known that a spit mask should not be placed on a detainees face after he has been pepper sprayed until after he has been properly decontaminated.

h.   Despite being aware of Kenneth Lawrence's seizure condition, in deliberate indifference, Defendants took no action to see to it that people were kept out of his way; to clear hard or sharp objects away from him; to prevent efforts to hold him down or to stop his movements; to place him on his side; to help

44

keep his airway clear; to document the start time or length of his seizure; to insure that nothing was put in his mouth.

i.   The Defendant struck Kenneth Lawrence causing his nose to be fractured;

j.   The Defendants stood by and allowed the Kenneth Lawrence to be struck;

k.   The Defendant pepper sprayed Kenneth Lawrence;

l. The Defendants allowed Kenneth Lawrence to be pepper sprayed;

m.   After Kenneth Lawrence was pepper sprayed, the Defendants failed to clear Kenneth Lawrence's airways from pepper spray;

n.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendant put a spit mask on him;

o.   After Kenneth Lawrence was pepper sprayed having suffered a seizure, the Defendants failed to prevent the Defendant from putting a spit mask on him;

p.   Despite the documented history of seizures, the fact that he had not been given Keppra, these Defendants allowed Thorazine to be administered to Kenneth Lawrence.

### DECLARATORY RELIEF

77.   Pursuant to Ark. Code Ann. § 16-111-104, part of the Declaratory Judgment Act, and 28 U.S.C.S. § 2201, Plaintiff requests that the Court determine the rights of Kenneth Lawrence

under 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the Arkansas Constitution, and the Arkansas Civil Rights Act and that the Court declare the following, that under these constitutional provisions, laws and statutes:

a. Kenneth Lawrence had the right to adequate medical treatment which specifically included the right to access to medicine to control his seizures;

b. Kenneth Lawrence had the right to immediate and timely access to medicine needed to ameliorate, control and stop life threatening seizures;

c. Kenneth Lawrence had the right to be free from imposition of objects that restricted his breathing after being pepper sprayed;

d. Kenneth Lawrence had the right to be decontaminated after being pepper sprayed;

e. Kenneth Lawrence had the right to be free from the use of force when they are suffering from a seizure;

f. Kenneth Lawrence had the right to have the next of kin listed in his intake paperwork that were listed emergency contacts notified when he was taken unconscious, helpless and at the point of death from the facility to a hospital.

g. Defendants are not immune from suit.

78. Plaintiff demands a trial by jury.

79.   Plaintiff reserves his right to amend this complaint.

WHEREFORE, Plaintiff respectfully prays that this Court enter a judgment granting a declaratory judgment that the Defendants' acts, policies, and practices complained of herein, violated Plaintiff's rights secured by the due process clause of the Fifth and Fourteenth Amendments and the rights secured by the Eighth Amendment to the United States Constitution; joint and several nominal, compensatory, and punitive damages against the Defendants for Plaintiff, reasonable attorneys' 42 U.S.C. § 1988 fees; and, all other proper and just relief, whether specifically prayed for herein or not.

Respectfully submitted,

**YVONNE LAWRENCE, ADMINISTRATOR**
**ESTATE OF KENNETH LAWRENCE**

Willard Proctor, Jr.
Attorney for Plaintiff
2500 South State Street
Little Rock, AR 72206-2162
(501) 378-7720
Arkansas Bar No.: 87136
willard@wpjrlaw.com

Lawrence Walker
Attorney for Plaintiff
1723 Broadway
Little Rock, AR 72206
(501) 374-3758
Arkansas Bar No.: 2012042

## AFFIDAVIT

Comes now the undersigned and solemnly swears that the following facts and information are true and correct to the best of my knowledge and belief:

1.  I am the attorney for the Plaintiff in the attached pleading.

2.  Neither me nor my client knows the identities of the John and Jane Doe designations set forth in the pleading nor the insurance carriers for any entity or individual not susceptible to a direct cause of action.

3.  Upon determining the identity of the unknown parties responsible for the injuries and damages sustained by Plaintiff, or for paying those damages, I will timely amend the Complaint to specifically designate the names of the unknown parties.

4.  This Affidavit is filed in accordance with Ark. Code Ann. § 16-56-125.

_____
Willard Proctor, Jr.

SWORN TO AND SUBSCRIBED TO before me, a Notary Public, on this 31st day of December, 2018.

____11-7-2021____
My Commission Expires

_____
Notary Public

```
KYESHA RAULSTON
Notary Public-Arkansas
Pulaski County
My Commission Expires 11-07-2021
Commission # 12384954
```

48